1

2

3

4

5

6

7

# UNITED STATES DISTRICT COURT

### EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| GILBERT JOHN TELLY, | Case No. 1:19–cv–00456–SKO |
| Plaintiff, | |
| v. | ORDER ON PLAINTIFF'S SOCIAL SECURITY COMPLAINT |
| ANDREW SAUL, Commissioner of Social Security,[1] | |
| Defendant. | (Doc. 1) |
| _____/ | |

## I.      INTRODUCTION

On April 8, 2019, Plaintiff Gilbert John Telly ("Plaintiff") filed a complaint seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner" or "Defendant") denying his applications for disability insurance benefits ("DIB") and Supplemental Security Income (SSI) under the Social Security Act (the "Act"). (Doc. 1.) The matter is currently before the Court on the parties' briefs, which were submitted, without oral argument, to the Honorable Sheila K. Oberto, United States Magistrate Judge.[2]

///

_____

[1] On June 17, 2019, Andrew Saul became the Commissioner of the Social Security Administration. *See* https://www.ssa.gov/agency/commissioner.html.  He is therefore substituted as the defendant in this action.  *See* 42 U.S.C. § 405(g) (referring to the "Commissioner's Answer"); 20 C.F.R. § 422.210(d) ("the person holding the Office of the Commissioner shall, in his official capacity, be the proper defendant").

[2] The parties consented to the jurisdiction of a U.S. Magistrate Judge.  (Docs. 8, 9.)

1

## II.      BACKGROUND

2
Plaintiff was born on March 24, 1957, can communicate in English, completed high school,

3
and previously worked in road repair laying asphalt and in building demolition.  (Administrative

4
Record ("AR") 38, 39, 44, 87, 97, 109, 124, 298, 314, 301, 302, 303, 348.)  Plaintiff filed claims

5
for DIB and SSI payments on August 31, 2015, alleging he became disabled on May 11, 2011, due

6
to stroke, heart attack, and a back injury.[3]  (AR 87, 88, 97, 98, 109, 110, 124, 125, 243–53, 298,

7
302, 314, 348.)

8
**A.      Relevant Medical Evidence[4]**

9
**1.      Sara Boyd, PsyD.**

10
On April 3, 2013, Plaintiff presented to Dr. Boyd for a psychological evaluation at the

11
request of the State Disability Determination Service, in connection with Plaintiff's prior disability

12
applications.   (AR 379–83.)   Dr. Boyd assessed Plaintiff with "borderline low range" in

13
"[r]easoning/comprehension/conception," "[n]onverbal reasoning/perceptual organization," and

14
"[a]ttention/concentration."  (AR 380.)  He had a "low average range" in his "[m]ental processing

15
speed."  (AR 381.)  Dr. Boyd also found Plaintiff's "Full Scale IQ" was 74, which was within the

16
"borderline low range" of cognitive functioning.  (AR 381.)  From this, Dr. Boyd's overall clinical

17
impression was "that of an individual with below average cognitive abilities," who presents with

18
"symptoms of learning disorder or cognitive disorder and mild to moderate deficits in some areas

19
of functioning."  (AR 382.)  She opined that Plaintiff had mild to moderate impairment of the ability

20
to understand carry out and remember detailed and complex instructions, and mild impairment of

21
the ability to perform and sustain day-to-day work activities including issues of attendance and

22
safety.  (AR 382.)

23
**2.      Darrell Corben, M.D.**

24
Plaintiff presented to Dr. Corben for a physical evaluation on April 18, 2013, at the request

25
of the State Disability Determination Service, in connection with Plaintiff's prior disability

26

27
[3] Plaintiff had previously filed claims for DIB and SSI benefits on December 19, 2012, which were denied at the initial level on May 7, 2013.  (AR 67–86.)

28
[4] Because the parties are familiar with the medical evidence, it is summarized here only to the extent relevant to the contested issues.

applications.  (AR 387–90.)  Dr. Corben found Plaintiff's examination was "significant for mild decrease in the motor strength on [Plaintiff's] right side," with his right-sided motor strength being "4-4+/5" on the right and normal at 5/5 on the left."  (AR 389.)  There was no evidence of any clubbing cyanosis or edema.  (AR 389.) Dr. Corben diagnosed Plaintiff with "[a]therosclerotic heart disease with history of myocardial infarction in 2000," "[h]istory of CVA event in 1998 with apparent mild residual weakness on [Plaintiff's] right side," "[h]ypertension," and "[h]ypercholesterolemia."  (AR 389.)  He opined that Plaintiff could perform a range of light work, as follows:

> [Plaintiff] can walk up to six hours per day.  [Plaintiff] can sit without limitations.  [Plaintiff] does not use or require an assistive device.  [Plaintiff] can lift and carry up to 20 pounds occasionally and 10 pounds frequently.  Given [Plaintiff's] history it would appear that [Plaintiff] could engage in the following activities up to four hours per day as long as provision was made for [Plaintiff] to be able to take periodic rest breaks as needed: Climbing, balancing, stooping, kneeling, crouching, and crawling.  [Plaintiff] would have no limitations with regards to the following activities: Reaching, handling, fingering, and feeling.  Given [Plaintiff's] age and poor overall state of health it would not be recommended for [Plaintiff's] overall safety that he engage in the following activities: Working at heights, around heavy machinery, around extremes of temperature, around chemicals, around dusts, fumes, or gases, or around excessive noise.

(AR 389.)

### 3.   Apex Medical Group

Plaintiff presented on May 7, 2014, to establish care and for a referral to a cardiologist. (AR 404–405.)  On June 4, 2014, Plaintiff presented for a physical examination.  (AR 398–403.) His physical examination was normal, but he was assessed with hypercholesterolemia and unspecified hyperlipidemia, and prescribed medication.  (AR 403.)

On February 1, 2016, Plaintiff presented with anxiety, shortness of breath, and chest pain, and stated that he had attempted suicide.  (AR 477–79.)  He was diagnosed with chest pain and referred to a cardiologist for evaluation and treatment.  (AR 478.)  Plaintiff was also assessed with major depressive disorder and referred to a clinical therapist.  (AR 478.)

### 4.   Central Valley Cardiovascular Medical Group

On June 11, 2014, Plaintiff presented for an appointment to go over his echocardiogram

and treadmill stress test results, following his referral.  (AR 421–24.)  He also complained of chest pain. (AR 421, 422.)  Plaintiff's echocardiogram showed a "septal wall abnormality and preserved LVEF."  (AR 423, 424.)  His treadmill test showed "mild upsloping ST depression but [with] no chest pain."  (AR 423, 424.)  Beta blockers were added to Plaintiff's medication, with left heart catherization recommended if symptoms persisted.  (AR 423, 424.)  Plaintiff was assessed with coronary arteriosclerosis due to his "mildly positive treadmill stress test."  (AR 423, 424.)  He was instructed to obtain a lipid panel and continue taking aspirin, statin, and beta blockers.  (AR 423, 424.)

Plaintiff complained of increasing chest pains on May 27, 2016, July 29, 2016, October 21, 2016, December 29, 2017 and January 19, 2018.  (AR 526–35.)  Upon examination, he had diminished pulses in his extremities.  (AR 526, 528, 530, 533, 535.)  Plaintiff was diagnosed with chest pain, dyspnea, shortness of breath, primary hypertension, palpitations, and disorder of arteries and arterioles.  (AR 526–29.)  He was recommended to take nitroglycerin, aspirin, statins and beta blockers.  (AR 527, 529, 534, 536.)

An ultrasound of Plaintiff's bilateral lower arterial system performed on September 30, 2016 showed moderate heterogeneous plaque and mild to moderate stenosis.  (AR 532.)  Plaintiff underwent an echocardiogram on January 9, 2018, which showed heterogeneous plaque throughout his lower extremity arterial system and mild to moderate stenosis.  (AR 538–39.)

**5.      Samuel B. Rush, M.D.**

On November 20, 2015, internist Dr. Rush performed a complete medical evaluation of Plaintiff at the request of the California Department of Social Services, Disability Determination Service.  (AR 447–51.)  Plaintiff reported that he had a heart attack in 2010, but Dr. Rush noted that it is "not well documented." (AR 447.)  Plaintiff reported that he still experiences "occasional chest tightness for which he takes nitroglycerin," and that in 1999 he had a "stroke with right sided weakness and loss of speech" that has "cleared up completely."  (AR 447.)  Upon examination, which was normal, Dr. Rush noted that Plaintiff's current symptoms were "not strongly suggestive of angina" and there was no symptoms or signs of congestive heart failure.  (AR 450.)  Regarding Plaintiff's history of stroke, there was also no evidence of right sided weakness or aphagia at that

1  time.  (AR 450.)  Dr. Rush opined that Plaintiff had no impairment-related physical limitations.
2  (AR 450–51.)

3  **6.  Farshid Yadegar, Ph.D.**

4  On March 22, 2016, psychologist Dr. Yadegar performed a comprehensive psychiatric
5  examination of Plaintiff.  (AR 454–59.)  Plaintiff was observed to be very well attired, clean, hair
6  combed, and well-kempt, despite being homeless.  (AR 454.)  He complained that he had suffered
7  four heart attacks, two strokes, and was depressed.  (AR 454.)  Plaintiff mentioned a history of
8  suicidal ideation and anxiety attacks.  (AR 455.)  Plaintiff reported being constantly active and
9  moving, as he is living outside and working on bottles and tools to buy as sell.  (AR 455.)  Dr.
10  Yadegar observed that Plaintiff "appears to be overly energetic hyperactive and has to move
11  constantly.  Staying focused active and involved appear to be therapeutic for him."  (AR 455.)
12  Plaintiff can take care of and keep his clothing clean, as well as feed himself and take care of all
13  his basic needs.  (AR 455.)

14  Plaintiff's concentration, persistence, and pace were good.  (AR 455.)  Dr. Yadegar noted
15  Plaintiff smiled frequently and seemed to be well cared for.  (AR 455.)  Plaintiff reported "getting
16  angry a lot" and wanting to hurt people.  (AR 455.)  He denied paranoia and auditory hallucinations.
17  (AR 456.)  When Dr. Yadegar asked about Plaintiff's mood and affect, he "avoided the question"
18  and instead "directed his attention to talk about how bad his depression is."  (AR 456.)

19  Upon mental examination, Dr. Yadegar noted that Plaintiff's memory was a "concern."
20  (AR 456.)  Plaintiff had "good interpersonal skills" and his concentration appeared to be good.
21  (AR 456.)  Dr. Yadegar observed Plaintiff's abstract thinking was intact, but his judgment was
22  poor.  (AR 457.)  He diagnosed Plaintiff with adjustment disorder and opined that Plaintiff was
23  mildly impaired in his ability to accept instructions from supervisors, to maintain regular
24  attendance in the workplace, and to deal with usual stress encountered in the workplace.  (AR 457.)

25  **7.  Sutter Health**

26  On March 30, 2016, Plaintiff presented to the emergency department with sudden right
27  thigh pain that traveled to his chest.  (AR 460.)  He was diagnosed with "muscle spasm of right
28  leg" and "coronary artery disease, angina presence unspecified, unspecified vessel or lesion type,

1  [and] unspecified whether native or transplanted heart."  (AR 463.)  Plaintiff was discharged and

2  given a prescription for acetaminophen, aspirin, and nitroglycerin.  (AR 463.)

3          **8.      Merced County Department of Mental Health**

4          On May 6, 2016, Plaintiff presented to the Merced County "Community Access to

5  Recovery Services" office for evaluation.  (AR 509–22.)  He presented with mild depressive

6  symptoms and reported being homeless.  (AR 509.)  Upon examination, Plaintiff had slowed and

7  restless motor activity, short attention, impaired judgment, and was unable to process abstraction.

8  (AR 515.)

9          On May 25, 2016, Plaintiff was found to meet the criteria for "major depressive disorder,

10 recurrent, moderate."  (AR 492, 493.)  As a result of his depression, Plaintiff was deemed to have

11 "[a] significant impairment in an important area of life functioning," or [a] probability of significant

12 deterioration in an important area of life functioning."  (AR 497.)  By June 24, 2016, Plaintiff was

13 an active client of the Merced County Department of Mental Health Service and was seen bi-

14 weekly for therapy service to treat his major depressive disorder.  (AR 523.)

15         Plaintiff presented to Zoe Martinez, M.D. on August 12, 2016 for a psychiatric evaluation

16 following a diagnosis of major depressive disorder.  (AR 487–90.)  Upon examination, Dr.

17 Martinez noted Plaintiff's mood was depressed and frustrated, with a depressed and slightly

18 anxious affect.  (AR 490.)  She assessed Plaintiff with major depressive disorder with "dependent

19 personality traits which may be secondary to physical health issues."  (AR 490.)  Dr. Martinez

20 observed that Plaintiff's depression "causes [him] to isolate himself become easily angered and

21 frustrated and easily overwhelmed when given more then [sic] one directive.  This impairs

22 [Plaintiff's] ability to work and maintain relationships."  (AR 490.)  She continued:

23         [Plaintiff] feels anxious 6 days a week where he worries about many things.
           This causes [Plaintiff] to only be able to sleep 5 hours or less a night, have
24         a history of ulcers, fatigue and difficulty making decisions [sic].  This
           contributes to [Plaintiff] not being able to work or be self sufficient.
25

26 (AR 490.)  Dr. Martinez prescribed Lexapro for his symptoms.  (AR 490.)

27         On November 4, 2016, Plaintiff followed up with Dr. Martinez for medication management.

28 (AR 485.)  He reported "multiple stressors" including "significant issues with housing" as well as

health issues.  (AR 485.)  Plaintiff stated he has "two partially blocked coronary arteries which his physician is trying to manage medically, but that if that does not work, may require stenting."  (AR 485.)  Dr. Martinez's examination of Plaintiff revealed an "okay" mood with otherwise normal results, and she observed he was tolerating Lexapro with a "good response."  (AR 485.)

Dr. Martinez saw Plaintiff on June 26, 2017, for a follow up appointment.  (AR 481–82.)  He continued to complain of multiple psychological stressors but felt that his medications were adequate.  (AR 481.)  Dr. Martinez agreed that Plaintiff was stable on his current medications.  (AR 481.)

### 9.    State Agency Physicians

On April 15, 2013, in connection with the adjudication of Plaintiff's prior disability claims, state agency physician G. Ikawa, M.D., reviewed the record determined that Plaintiff had no medically determinable mental impairments.  (AR 72, 73, 82, 83.)  On May 6, 2013, state agency physician I. Ocrant found that Plaintiff had no severe impairments.  (AR 72–73, 82–83.)

On December 9, 2015, in connection with Plaintiff's current disability claims, state agency physician P. Frye, M.D., found that Plaintiff had medically determinative impairments of recurrent arrhythmias and "other and unspecified arthropathies," which were both severe.  (AR 92, 102.)  Dr. Frye assessed Plaintiff's physical residual functional capacity (RFC)[5] and found that Plaintiff's exertional limitations limited him to medium work.  (AR 91–93, 95, 101–103 ,105.)

Upon reconsideration on April 14, 2016, state agency physician K. Quint, M.D., reviewed the record and affirmed Dr. Frye's physical RFC findings.  (AR 115, 116, 119–21, 131, 134, 136.)  In so doing, Dr. Quint noted "[w]hile the evidence supports some functional limitations, it does not support complete inability to work."  (AR 118.)

Plaintiff's mental RFC was also assessed at the reconsideration level by state agency

---

[5] RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis of 8 hours a day, for 5 days a week, or an equivalent work schedule.  TITLES II & XVI: ASSESSING RESIDUAL FUNCTIONAL CAPACITY IN INITIAL CLAIMS, Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996).  The RFC assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments.  *Id.*  "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record including, inter alia, medical records, lay evidence, and 'the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment.'"  *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

physician H. Amado.  (AR 116, 117, 131, 132.)  Dr. Amado found that Plaintiff had the medically determinable impairment of affective disorder, which was not severe and would impose only mild limitations.  (AR 116, 117, 131, 132.)

**B.     Administrative Proceedings**

The Commissioner denied Plaintiff's applications for benefits initially on December 9, 2015, and again on reconsideration on April 18, 2016.  (AR 141–50; AR 157–67.)  Consequently, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  (AR 170–186.)  The ALJ conducted a hearing on February 22, 2018.  (AR 30–66.).  Plaintiff appeared at the hearing with his counsel and testified as to his alleged disabling conditions and work history.  (AR 38–45, 48–61.)  A Vocational Expert also testified at the hearing.  (AR 45–47, 62–64.)

**C.     The ALJ's Decision**

In a decision dated April 19, 2018, the ALJ found that Plaintiff was not disabled, as defined by the Act.  (AR 15–23.)  The ALJ conducted the disability analysis set forth in 20 C.F.R. §§ 404.1520, 416.920.   (AR 18–23.)   The ALJ decided that Plaintiff met the insured status requirements of the Act through December 1, 2014, and he had not engaged in substantial gainful activity since May 11, 2011, the alleged onset date (step one).  (AR 18.)  The ALJ found Plaintiff had medically determinable impairments, including: heart attacks, strokes, back spasms, and adjustment disorder.  (AR 18.)  At step two, the ALJ determined that Plaintiff did not have any severe impairment or combination of impairments that that significantly limited his ability to perform basic work-related activities for a period of twelve consecutive months.  (AR 18–23.)  The ALJ further found that Plaintiff had not been under a disability, as defined by the Act, from May 11, 2011, through the date of the decision.  (AR 23.)  Therefore, Plaintiff was not disabled as defined by the Act.  (AR 23.)

Plaintiff sought review of this decision before the Appeals Council, which denied review on February 4, 2019.  (AR 1–6.)  Therefore, the ALJ's decision became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.

///

///

# III.     LEGAL STANDARD

## A.     Applicable Law

An individual is considered "disabled" for purposes of disability benefits if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). However, "[a]n individual shall be determined to be under a disability only if [her] physical or mental impairment or impairments are of such severity that [s]he is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." *Id.* § 423(d)(2)(A).

"In determining whether an individual's physical or mental impairment or impairments are of a sufficient medical severity that such impairment or impairments could be the basis of eligibility [for disability benefits], the Commissioner" is required to "consider the combined effect of all of the individual's impairments without regard to whether any such impairment, if considered separately, would be of such severity." *Id.* § 423(d)(2)(B).  For purposes of this determination, "a 'physical or mental impairment' is an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Id.* § 423(d)(3).

"The Social Security Regulations set out a five-step sequential process for determining whether a claimant is disabled within the meaning of the Social Security Act." *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999) (citing 20 C.F.R. § 404.1520); *see also* 20 C.F.R. § 416.920. The Ninth Circuit has provided the following description of the sequential evaluation analysis:

> In step one, the ALJ determines whether a claimant is currently engaged in substantial gainful activity.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step two and evaluates whether the claimant has a medically severe impairment or combination of impairments.  If not, the claimant is not disabled.  If so, the ALJ proceeds to step three and considers whether the impairment or combination of impairments meets or equals a listed impairment under 20 C.F.R. pt. 404, subpt. P, [a]pp. 1.  If so, the claimant is automatically presumed disabled.  If not, the ALJ proceeds to step four and assesses whether the claimant is capable of performing her past relevant work.  If so, the claimant is not disabled.  If not, the ALJ proceeds to step five and examines whether the claimant has the [RFC] . . . to

1    perform any other substantial gainful activity in the national economy.  If so, the
     claimant is not disabled.  If not, the claimant is disabled.

2    *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005); *see, e.g.*, 20 C.F.R. § 416.920(a)(4)

3    (providing the "five-step sequential evaluation process" for SSI claimants).  "If a claimant is found

4    to be 'disabled' or 'not disabled' at any step in the sequence, there is no need to consider subsequent

5    steps." *Tackett*, 180 F.3d at 1098 (citing 20 C.F.R. § 404.1520); 20 C.F.R. § 416.920.

6        "The claimant carries the initial burden of proving a disability in steps one through four of

7    the analysis."  *Burch*, 400 F.3d at 679 (citing *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir.

8    1989)).  "However, if a claimant establishes an inability to continue her past work, the burden shifts

9    to the Commissioner in step five to show that the claimant can perform other substantial gainful

10   work." *Id.* (citing *Swenson*, 876 F.2d at 687).

11   **B.    Scope of Review**

12       "This court may set aside the Commissioner's denial of [social security] benefits [only]

13   when the ALJ's findings are based on legal error or are not supported by substantial evidence in

14   the record as a whole."  *Tackett*, 180 F.3d at 1097 (citation omitted).  "Substantial evidence is

15   defined as being more than a mere scintilla, but less than a preponderance." *Edlund v. Massanari*,

16   253 F.3d 1152, 1156 (9th Cir. 2001) (citing *Tackett*, 180 F.3d at 1098).  "Put another way,

17   substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to

18   support a conclusion." *Id.* (citing *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

19       "This is a highly deferential standard of review . . . ." *Valentine v. Comm'r of Soc. Sec.*

20   *Admin.*, 574 F.3d 685, 690 (9th Cir. 2009).  "The ALJ's findings will be upheld if supported by

21   inferences reasonably drawn from the record." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th

22   Cir. 2008) (citation omitted).  Additionally, "[t]he court will uphold the ALJ's conclusion when

23   the evidence is susceptible to more than one rational interpretation."  *Id.*; *see, e.g.*, *Edlund*, 253

24   F.3d at 1156 ("If the evidence is susceptible to more than one rational interpretation, the court may

25   not substitute its judgment for that of the Commissioner." (citations omitted)).

26       Nonetheless, "the Commissioner's decision 'cannot be affirmed simply by isolating a

27   specific quantum of supporting evidence.'" *Tackett*, 180 F.3d at 1098 (quoting *Sousa v. Callahan*,

28   143 F.3d 1240, 1243 (9th Cir. 1998)).  "Rather, a court must 'consider the record as a whole,

weighing both evidence that supports and evidence that detracts from the [Commissioner's] conclusion.'" *Id.* (quoting *Penny v. Sullivan*, 2 F.3d 953, 956 (9th Cir. 1993)).

Finally, courts "may not reverse an ALJ's decision on account of an error that is harmless." *Molina v. Astrue*, 674 F.3d 1104, 1111 (9th Cir. 2012) (citing *Stout v. Comm'r, Soc. Sec. Admin.*, 454 F.3d 1050, 1055–56 (9th Cir. 2006)).  Harmless error "exists when it is clear from the record that 'the ALJ's error was inconsequential to the ultimate nondisability determination.'" *Tommasetti*, 533 F.3d at 1038 (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 885 (9th Cir. 2006)).  "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."  *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009) (citations omitted).

## IV.    DISCUSSION

Plaintiff asserts that the ALJ failed to find his medically determinable impairments to be severe at step two of the sequential evaluation process, and that he further erred by not considering the cumulative effect of her multiple impairments.    (Doc. 19 at 4; Doc. 23 at 3–4.)   More particularly, Plaintiff contends the ALJ erred by failing to find Plaintiff's combination of physical and intellectual/mental impairments are severe for the following reasons: (1) objective evidence shows Plaintiff's medically determinable impairments of heart attacks and strokes are severe; (2) treatment records document objective findings of deficiencies in Plaintiff's mental and cognitive functioning; (3) consultative examiner Dr. Corben diagnosed Plaintiff with atherosclerotic heart disease hypertension, and hypercholesterolemia and opined he was limited to a range of light work; (4) consultative examiner Dr. Boyd opined Plaintiff had mild to moderate impairment of the ability to understand carry out and remember detailed and complex instructions; and (5) consultative examiner Dr. Yadegar diagnosed Plaintiff with adjustment disorder and opined to mild limitations in his ability to accept instructions from supervisors, to maintain regular attendance in the workplace, and to deal with usual stress encountered in the workplace. (*Id*. at 4–11.) Alternatively, Plaintiff contends that the ALJ erred in failing to develop the record as to any ambiguity regarding Plaintiff's cardiovascular symptomology onset date.  (*Id*. at 12–13.)

Defendant counters that the ALJ's step two determination is supported by substantial evidence, and further that the ALJ did not have a duty to develop the record because it was not

ambiguous.  (Doc. 20 at 5–10.)

**A.     The ALJ Committed Harmful Error at Step Two**

**1.     Legal Standard**

"At step two of the five-step sequential inquiry, the Commissioner determines whether the claimant has a medically severe impairment or combination of impairments." *Smolen v. Chater*, 80 F.3d 1273, 1289–90 (9th Cir. 1996) (citing *Bowen v. Yuckert*, 482 U.S. 137, 140–41 (1987)). "[A]t the step two inquiry, . . . the ALJ must consider the combined effect of all of the claimant's impairments on [their] ability to function, without regard to whether each alone was sufficiently severe." *Id.* at 1290 (citing 42 U.S.C. § 423(d)(2)(B) and Social Security Ruling ("SSR") 86–8).

"[A]n impairment is not severe if it does not significantly limit [the claimant's] . . . ability to do basic work activities." *Id.* at 1290 (citing 20 C.F.R. §§ 404.1520(c) & 404.1521(a)). "[B]asic work activities are the abilities and aptitudes necessary to do most jobs." SSR 85–28, 1985 WL 56856, at *3.  Examples of "basic work activities" include (1) "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," (2) "[c]apacities for seeing, hearing, and speaking," (3) "[u]nderstanding, carrying out, and remembering simple instructions," (4) "[u]se of judgment," (5) "[r]esponding appropriately to supervision, co-workers and usual work situations," and (6) "[d]ealing with changes in a routine work setting."  20 C.F.R. §§ 404.1522(b); 416.922(b).

"An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality that has 'no more than a minimal effect on an [individual's] ability to work.'" *Smolen*, 80 F.3d at 1290 (quoting SSR 85–28).  Additionally, "an ALJ may find that a claimant lacks a medically severe impairment or combination of impairments only when his conclusion is 'clearly established by medical evidence.'" *Webb v. Barnhart*, 433 F.3d 683, 687 (9th Cir. 2005) (citing SSR 85–28); *cf. Ukolov v. Barnhart*, 420 F.3d 1002, 1006 (9th Cir. 2005) (finding that the claimant "failed to meet his burden of establishing disability" where "none of the medical opinions included a finding of impairment, a diagnosis, or objective test results").

1    "Great care should be exercised in applying the not severe impairment concept." SSR 85–

2    28. "The Commissioner has stated that '[i]f an adjudicator is unable to determine clearly the effect

3    of an impairment or combination of impairments on the individual's ability to do basic work

4    activities, the sequential evaluation should not end with the not severe evaluation step.'" *Webb*,

5    433 F.3d at 687 (alteration in original) (quoting SSR 85–28).

6        Ultimately, "[t]he severity regulation increases the efficiency and reliability of the

7    evaluation process by identifying at an early stage those claimants whose medical impairments are

8    so slight that it is unlikely they would be found to be disabled even if their age, education, and

9    experience were taken into account." *Yuckert*, 482 U.S. at 153. In other words, "the step-two

10   inquiry is a de minimis screening device to dispose of groundless claims." *Smolen*, 80 F.3d at 1290

11   (*citing Yuckert*, 482 U.S. at 153–54). Nonetheless, "[t]he plaintiff has the burden of establishing

12   the severity of the impairment." *Cookson v. Comm'r of Soc. Sec.*, No. 2:12–cv–2542–CMK, 2014

13   WL 4795176, at *2 (E.D. Cal. Sept. 25, 2014); *see, e.g.*, *Burch*, 400 F.3d at 679 ("The claimant

14   carries the initial burden of proving a disability in steps one through four of the analysis.") (citing

15   *Swenson*, 876 F.2d at 687)).

16       **2.    Discussion**

17       The ALJ identified Plaintiff's heart attacks, stroke, back spasms, and adjustment disorder

18   as medically determinable impairments. (AR 18.) Nonetheless, the ALJ found none of the

19   impairments were severe. He reasoned as follows: "The record includes findings that [Plaintiff]

20   experiences mild to moderate stenosis in multiple peripheral arteries in his extremities but there is

21   no evidence it causes functional limitations . . . [and] there is no clinical support for the reported

22   cardiovascular impairments. [A] recent heart assessment showed a normal ejection fraction, no

23   heart abnormalities, and no evidence of a prior heart attack and no evidence of a current or prior

24   medical impairment of the heart. . . . The record also includes a mildly positive treadmill stress test

25   and indicates that [Plaintiff's] pulmonary cardiovascular and respiratory functioning was normal

26   during objective physical status exams throughout the period at issue. . . . [T]hese conditions were

27   being managed medically and should be amenable to proper control by adherence to recommended

28   medical management and medication compliance . . . . [N]o aggressive treatment was

1  recommended or anticipated for these conditions." (AR 19–20.)

2       The ALJ discussed Plaintiff's alleged impairments related to his adjustment disorder,

3  noting Dr. Yadegar opined in March 2016 that "[Plaintiff's] mental impairments are non-severe"

4  and observing that, according to the objective evidence, Plaintiff "was mostly alert, oriented,

5  dressed and groomed appropriately, cooperative, engaged, responsive, made good eye contact,

6  spoke normally and not in acute distress, with appropriate mood and affect, normal memory, good

7  cognition, linear thought content, normal thought process, and normal judgment and insight." (AR

8  22.)

9       Viewing the record as a whole, the medical and opinion evidence in this case does not

10  "clearly establish" that Plaintiff lacks a medically severe impairment or combination of

11  impairments. *Webb*, 433 F.3d at 687. First, the ALJ's conclusion that Plaintiff's impairments were

12  nonsevere was based on an incomplete, and therefore inadequate, discussion of the medical

13  evidence. For example, the ALJ characterizes medical records showing Plaintiff "experiences mild

14  to moderate stenosis in multiple peripheral arteries in his extremities" as self-reported and "carried

15  forward, over time, even though there is no clinical support for the reported cardiovascular

16  impairments." (AR 19.) There is no indication in these treatment notes that Plaintiff "made these

17  reports [of mild to moderate stenosis] to medical providers"—instead, findings of diminished

18  pulses in Plaintiff's extremities were found during physical examinations by treating physicians at

19  the Central Valley Cardiovascular Medical Group, which occurred in May 2016, July 2016,

20  October 2016, December 2017 and January 2018. (AR 526–35.) More importantly, the ALJ

21  ignores the objective testing that corroborates these alleged self-reports. An ultrasound of

22  Plaintiff's bilateral lower arterial system performed on September 30, 2016 showed moderate

23  heterogeneous plaque and mild to moderate stenosis. (AR 532.) Plaintiff also underwent an

24  echocardiogram on January 9, 2018, which showed heterogeneous plaque throughout his lower

25  extremity arterial system and mild to moderate stenosis. (AR 538–39.)

26       The ALJ also noted Plaintiff's "mildly positive treadmill stress test," yet incorrectly

27  concluded that Plaintiff's "pulmonary cardiovascular and respiratory functioning was normal

28  during objective physical status exams throughout the period at issue." (AR 20.) As set forth

1  above, physical examinations in May 2016, July 2016, October 2016, December 2017 and January

2  2018 were abnormal for diminished pulses in Plaintiff's extremities.  (AR 526–35.)  Moreover, the

3  ALJ failed to consider that, as a result of the positive stress test, Plaintiff was assessed with

4  coronary arteriosclerosis and was recommended to undergo a left heart catherization if his

5  symptoms persisted (AR 423, 424), which they did (*See* AR 526–35).  A recommendation for heart

6  catherization is also contrary to the ALJ's finding that "no aggressive treatment was recommended

7  or anticipated" for Plaintiff's conditions.  (AR 20.)  Thus, contrary to the ALJ's characterization of

8  Plaintiff's medical evidence, the record as a whole demonstrates a history of treatment for chest

9  pain, hypertension, arteriosclerosis, and stenosis that is supported by abnormal examination results

10  and objective testing.  *See Reddick v. Chater*, 157 F.3d 715, 722–23 (9th Cir. 1998) (An ALJ may

11  not "cherry pick" from a record to support the conclusion, but rather must account for the context

12  of the whole record.); *Gallant v. Heckler*, 753 F.2d 1450, 1456 (9th Cir. 1984) ("Although it is

13  within the power of the [ALJ] to . . . weigh conflicting evidence, he cannot reach a conclusion first,

14  and then attempt to justify it by ignoring competent evidence in the record that suggests an opposite

15  result.).

16      Next, with respect to Plaintiff's mental impairments, the ALJ again selectively highlighted

17  those portions of Plaintiff's records that supported the ALJ's conclusion that the impairments were

18  nonsevere, while downplaying or omitting evidence to the contrary.  *See id*.  For example, while

19  the ALJ noted objective evidence that showed Plaintiff was "mostly alert, oriented, dressed and

20  groomed appropriately, cooperative, engaged, responsive, made good eye contact, spoke normally

21  and not in acute distress, with appropriate mood and affect, normal memory, good cognition, linear

22  thought content, normal thought process, and normal judgment and insight" (AR 22), he omitted

23  evidence of a mental status examination in 2014, showing Plaintiff had "borderline low range"

24  reasoning, comprehension, attention, concentration, and cognitive functioning.  (AR 381.)

25      More recent examinations from 2016, which the ALJ also failed to discuss, showed Plaintiff

26  had a depressed and frustrated mood, depressed and slightly anxious affect, slowed and restless

27  motor activity, short attention, impaired judgment, and an inability to process abstraction, which

28  resulted in Plaintiff being diagnosed with major depressive disorder.  (AR 490, 492, 493, 515.)  In

1    August 2016, treating psychiatrist Dr. Martinez found Plaintiff's depression "impairs [Plaintiff's]

2    ability to work and maintain relationships" and that his anxiety "contributes to [Plaintiff] not being

3    able to work or be self sufficient." (AR 490.)  Dr. Yadegar, whose opinion the ALJ assigned

4    "significant weight," also found during his examination in March 2016 that Plaintiff's memory was

5    a "concern." (AR 456.)

6         Finally, the ALJ erred in his treatment of the opinion evidence.  The record contains

7    opinions from State agency consultative examiners Drs. Boyd and Corben.  Dr. Boyd's overall

8    clinical impression on April 3, 2013, was "that of an individual with below average cognitive

9    abilities," who presents with "symptoms of learning disorder or cognitive disorder and mild to

10   moderate deficits in some areas of functioning." (AR 382.)  Dr. Boyd opined that Plaintiff had

11   mild to moderate impairment of the ability to understand carry out and remember detailed and

12   complex instructions, and mild impairment of the ability to perform and sustain day-to-day work

13   activities, including issues of attendance and safety. (AR 382.)  In April 18, 2013, Dr. Corben

14   diagnosed Plaintiff with "[a]therosclerotic heart disease with history of myocardial infarction in

15   2000," "[h]istory of CVA event in 1998 with apparent mild residual weakness on [Plaintiff's] right

16   side," "[h]ypertension," and "[h]ypercholesterolemia." (AR 389.)  He opined that Plaintiff could

17   perform a range of light work. (AR 389.)

18        The ALJ's decision does not mention, let alone explain what, if any, weight he afforded the

19   opinions of Drs. Boyd and Corben. *See* SSR 96–6p, 1996 WL 374180 at *1, ("Findings . . . made

20   by State agency medical and psychological consultants . . . regarding the nature and severity of an

21   individual's impairment(s) must be treated as expert opinion evidence . . . ).  ALJs "may not ignore

22   these opinions and must explain the weight given to these opinions in their decisions." *Id*.  The

23   failure to discuss and consider Dr. Boyd's and Dr. Corben's opinions is reversible error. *See, e.g.,*

24   *Stout*, 454 F.3d at 1056 (reversing where ALJ to failed to provide any reasons for rejecting the

25   evidence at issue); *Higgins v. Astrue*, No. 1:09–cv–0709 GSA, 2010 WL 2302375, *11 (E.D. Cal.

26   June 7, 2010) (finding ALJ's decision to accord significant weight to a non-examining physician's

27   opinion, and to reject an examining physician's opinion, insufficient where ALJ did not explain

28   why).  "The opinion of an examining doctor, even if contradicted by the opinion of another [non-

16

1  examining] doctor, can only be rejected for specific and legitimate reasons that are supported by

2  the record." *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995) (as amended).  *See also Nguyen v.*

3  *Chater*, 100 F.3d 1462, 1464 (9th Cir. 1996) (holding that the ALJ erred because he neither

4  explicitly rejected an examining physician's opinion, nor set forth specific, legitimate reasons for

5  crediting a non-examining physician's opinion).

6       The Commissioner does not dispute that the ALJ failed to mention Dr. Boyd's and Dr.

7  Corben's opinions in his decision.  Instead, the Commissioner asserts that because the opinions of

8  Drs. Boyd and Corben were given in April 2013, before the relevant period of August 31, 2014,

9  they are "distant" and "not time relevant to Plaintiff's application at issue," and therefore it was

10 appropriate for the ALJ to omit them from his discussion.[6]  (Doc. 20 at 11.)  The ALJ however, did

11 not give this as a reason for rejecting the opinions—he simply ignored them.  The Court cannot

12 and will not attempt to insert its own post hoc rationale for the ALJ's failure to discuss the opinions

13 of Drs. Boyd and Corben.  *See Bray v. Comm'r Soc. Sec. Admin*., 554 F.3d 1219, 1225 (9th Cir.

14 2009) ("Long-standing principles of administrative law require us to review the ALJ's decision

15 based on the reasoning and factual findings offered by the ALJ—not post hoc rationalizations that

16 attempt to intuit what the adjudicator may have been thinking."); *Connett v. Barnhart*, 340 F.3d

17 871, 874 (9th Cir. 2003) (noting that a reviewing court is "constrained to review the reasons the

18 ALJ asserts.").  An agency's decision cannot be affirmed on the ground that the agency did not

19 invoke in making its decision.  *Pinto v. Massanari*, 249 F.3d 840, 847–48 (9th Cir. 2001).[7]

20      The ALJ also discussed and gave "some weight" to the opinions of State agency non-

21 examining physicians Drs. Frye and Quint that Plaintiff retained the RFC to perform medium work

22

23 [6] According to the Commissioner, there are two "relevant periods" in this case: August 31, 2014 through December 1, 2014, which pertains to Plaintiff's DIB application; and August 31, 2015 through April 19, 2018 (the date of the ALJ's decision), which pertains to his SSI application.  (Doc. 20 at 8.)

24 [7] Even if the Court were to consider the Commissioner's post hoc argument that the ALJ properly ignored the opinions solely because they predated the relevant period beginning August 31, 2014, it would not withstand scrutiny.  Although

25 evidence that predates the alleged onset date of disability is of limited relevance, *Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1165 (9th Cir. 2008), evidence like that at issue here, which predates the Plaintiff's application

26 date of August 31, 2015 but postdates the alleged onset date of May 11, 2011, is "pertinent to the alleged period of disability." *Pacheco v. Berryhill*, 733 F. App'x 356, 360 (9th Cir. 2018). *See Melinda M. v. Saul*, No. 2:19-CV-00266-

27 FVS, 2020 WL 4194987, at *6 (E.D. Wash. July 20, 2020); *Rico v. Berryhill*, No. 8:18-cv-00275-GJS, 2018 WL 6198460, at *4 (C.D. Cal. Nov. 28, 2018).  Presumably, the ALJ understood this when evaluating the opinions of State

28 agency non-examining physicians Drs. Ikawa and Ocrant, to which he assigned "significant weight" (AR 23), even though the opinions were given in <u>April and May 2013</u>, respectively.

1  (AR 23), yet he did not specify what portion of the opinion he was adopting and what portion he

2  was rejecting.  This silent rejection is of particular concern here, given that Drs. Frye and Quint

3  both found at **step two** that Plaintiff's medically determinable impairments of recurrent arrhythmias

4  and "other and unspecified arthropathies" were **severe**—a fact the ALJ did not mention.[8]  (AR 92,

5  102, 116, 131.)  Thus, it is apparent that the ALJ erred by rejecting, without any explanation, the

6  opinions of Drs. Frye and Quint that Plaintiff had the severe impairments of recurrent arrhythmias

7  and other and unspecified arthropathies.  *See* SSR 96–6p, 1996 WL 374180, at *2 (ALJs must

8  consider opinions from non-examining sources and explain the weight given to these opinions in

9  their decision); *Shafer v. Astrue*, 518 F.3d 1067, 1069–70 (9th Cir. 2008) (finding that the ALJ's

10  silent disregard of a portion of a non-examining physician's opinion "contravened governing

11  regulations requiring him to . . . evaluate every medical opinion received.").

12  In sum, while Plaintiff may not ultimately "succeed in proving that he is disabled," *Webb*,

13  433 F.3d at 688, the Court finds the ALJ "lacked substantial evidence to find that the medical

14  evidence clearly established" Plaintiff's lack of a severe impairment, either alone or in

15  combination.[9]  *Id*.  Accordingly, the ALJ's step two findings cannot stand.

16  **3.  Harmless Error Analysis**

17  The Ninth Circuit "ha[s] long recognized that harmless error principles apply in the Social

18  Security Act context." *Molina*, 674 F.3d at 1115 (citing *Stout*, 454 F.3d at 1054).  As such, "the

19  court will not reverse an ALJ's decision for harmless error." *Tommasetti*, 533 F.3d 1035, 1038

20  (9th Cir. 2008) (citing *Robbins.*, 466 F.3d at 885).  An error is harmless "where it is inconsequential

21  to the ultimate nondisability determination." *Molina*, 674 F.3d at 1115 (citations omitted); *see also*

22  *Treichler v. Comm'r of Soc. Sec. Admin.*, 775 F.3d 1090, 1099 (9th Cir. 2014) (stating that an error

23  is also harmless "'if the agency's path may reasonably be discerned,' even if the agency 'explains

24

25  [8] Indeed, it was only because Drs. Frye and Quint found a severe impairment at step two that they were obligated to continue the sequential analysis to determine that Plaintiff retained the RFC to perform medium work (AR 94–95,

26  101–02, 104–05, 120–21, to which the ALJ apparently gave "some weight."  (AR 23.)

[9] Because the Court finds that the ALJ's determination of non-severity was not supported by substantial evidence, it

27  does not consider Plaintiff's argument that the more lenient standard of review set forth by the district court in *Young v. Colvin*, which "requires the Court to reverse if objective evidence suggests that Plaintiff's impairments are more

28  than de minimis," No. CV-16-02264-PHX-DGC, 2017 WL 677167, at *4 (D. Ariz. Feb. 21, 2017), applies in this case. (*See* Doc. 19 at 4; Doc. 23 at 2.)

1  its decision with less than ideal clarity'") (quoting *Alaska Dep't of Envtl. Conservation. v. EPA*,

2  540 U.S. 461, 497 (2004)).  "In other words, in each case [courts] look at the record as a whole to

3  determine whether the error alters the outcome of the case." *Molina*, 674 F.3d at 1115.  "[T]he

4  nature of [the] application" of the "harmless error analysis to social security cases" is "fact-

5  intensive—'no presumptions operate' and '[courts] must analyze harmlessness in light of the

6  circumstances of the case.'" *Marsh v. Colvin*, 792 F.3d 1170, 1172 (9th Cir. 2015) (quoting

7  *Molina*, 674 F.3d at 1121).  "[T]he burden of showing that an error is harmful normally falls upon

8  the party attacking the agency's determination." *Shinseki v. Sanders*, 556 U.S. 396, 409 (2009)

9  (citations omitted).

10      In this case, contrary to the Commissioner's assertion (*see* Doc. 20 at 11–12), the ALJ's

11  erroneous treatment of the medical record and "implicit rejection" of the opinion evidence was not

12  harmless.[10]  Dr. Boyd opined in 2013 that Plaintiff had a mild to moderate impairment of the ability

13  to understand carry out and remember detailed and complex instructions.  Later, in 2016, treating

14  psychiatrist Dr. Martinez found Plaintiff's depression "impairs his ability to work" and that his

15  anxiety "contributed to [his] not being able to work."  With respect to Plaintiff's physical

16  impairments, Dr. Corben opined that Plaintiff was limited to a range of light work, and Drs. Frye

17  and Quint opined that he had the severe impairments of recurrent arrhythmias and other and

18  unspecified arthropathies.  Fully crediting these "implicitly rejected" opinions as to Plaintiff's

19  physical <u>and</u> mental impairments would have led the ALJ to consider the subsequent three steps in

20  the sequential analysis and could have led a reasonable ALJ to reach a different disability

21  determination.  (*See, e.g*., AR 64–65 (Plaintiff not employable where he must take two additional

22  breaks during the workday as a result of fatigue or chest pain); Medical-Vocational Guidelines, 20

23  CFR, Part 404, Subpart P, Appendix 2 § 202.04 (directing a finding of disability where Plaintiff's

24  RFC is limited to a range of light work).)  As a result, the Court cannot conclude that the ALJ's

25  premature termination of Plaintiff's claim was harmless. *Treichler*, 775 F.3d at 1099; *Stout*, 454

26  F.3d at1056; *Molina*, 674 F.3d at 1115.

27

28  [10] Contrary to the Commissioner's characterization, the ALJ did not "specifically reject" the opinions of Drs. Frye and Quint; he instead gave them "some weight," as discussed above.

1

**B.     Remand for Further Proceedings is Appropriate**

2

The Court has the discretion to remand the case for additional evidence and findings or to

3 award benefits. *Smolen*, 80 F.3d at 1292. The Court may award benefits if the record is fully

4 developed and further administrative proceedings would serve no useful purpose. *Id.* Remand is

5 appropriate when additional administrative proceedings could remedy defects. *Rodriguez v.*

6 *Bowen*, 876 F.2d 759, 763 (9th Cir. 1989). In this case, the Court finds that further proceedings

7 are necessary to properly evaluate the record, including the opinions of Plaintiff's examining  and

8 non-examining sources. Accordingly, the Court remands this matter to the Commissioner for

9 further administrative proceedings.[11] *See, e.g.*, *Chavez v. Saul*, No. 2:18-cv-1079-EFB, 2019 WL

10 4747698, at *6 (E.D. Cal. Sept. 30, 2019) (finding error at step two and remanding for further

11 administrative proceedings).

12

**C.     The Court Declines to Determine Plaintiff's Remaining Assertion of Error**

13

As the Court finds that remand is appropriate for the ALJ to reconsider the medical and

14 opinion evidence, the Court does not reach Plaintiff's additional assertion of error regarding the

15 ALJ's failure to further develop the record. *See Hiler v. Astrue*, 687 F.3d 1208, 1212 (9th Cir.

16 2012) ("Because we remand the case to the ALJ for the reasons stated, we decline to reach

17 [plaintiff's] alternative ground for remand."); *see also Newton v. Colvin*, No. 2:13–cv–2458–GEB–

18 EFB, 2015 WL 1136477, at *6 n.4 (E.D. Cal. Mar. 12, 2015) ("As the matter must be remanded

19 for further consideration of the medical evidence, the court declines to address plaintiff's remaining

20 arguments."); *Augustine ex rel. Ramirez v. Astrue*, 536 F. Supp. 2d 1147, 1153 n.7 (C.D. Cal. 2008)

21 ("[The] Court need not address the other claims plaintiff raises, none of which would provide

22 plaintiff with any further relief than granted, and all of which can be addressed on remand.").

23

**V.     CONCLUSION AND ORDER**

24

Based on the foregoing, the Court finds that the ALJ's decision is not supported by

25 substantial evidence and is, therefore, VACATED and the case REMANDED to the ALJ for further

26 proceedings consistent with this Order. The Clerk of this Court is DIRECTED to enter judgment

27

28

---

[11] Plaintiff does not contend that this case should be remanded for the payment of benefits and instead agrees that further proceedings are warranted.  (*See* Doc. 19 at 13.)

in favor of Plaintiff Gilbert John Telly and against Defendant Andrew Saul, Commissioner of Social Security.

IT IS SO ORDERED.

Dated:   **September 15, 2020**                              /s/ *Sheila K. Oberto*

UNITED STATES MAGISTRATE JUDGE